AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>FOUR ELECTRONIC DEVICES | )<br>)<br>) Case No. 3:19 mj 524<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A. This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the ____Southern____ District of ____Ohio____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. section 846 | Possession with the intent to distribute and to distribute a controlled substance |
| 21 U.S.C. section 841 | and conspiracy to commit the same |

The application is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Dennis Eng, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-4-19

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR ELECTRONIC DEVICES | Case No. _____  3:19 mj 524 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Dennis C. Eng, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 1998. I am currently assigned to the Cincinnati Division, Dayton Resident Agency. As such, I am charged with investigating crimes against the United States, including but not limited to violations of Title 18 and Title 21 of the United States Code (U.S.C.). I have received training in drug trafficking investigations and have participated in numerous narcotics-related investigations (ultimately leading to successful prosecution) that involved surveillance, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics. I am familiar with federal drug laws, and am aware

that it is a violation of 21 U.S.C. §§ 841(a)(1) and 846 to distribute and possess with intent to distribute controlled substances (including heroin and fentanyl), as well as to conspire to do the same.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched:

   a. Verizon – LG Model VN170, S/N: 609CQRN1916846, MEID HEX: A10000415874B2

   b. Verizon – LG Model VN170, S/N: 704CQFT2323347, MEID HEX: A10000416ADE5F

   c. Verizon Casio CE0700, S/N 132901073135, MEID HEX: A1000029088CAF

   d. Verizon Casio CE0700, S/N 142501431069, MEID HEX: A10000290EECF0

hereinafter collectively referred to as the "Devices." The Devices are currently located at 2329 Wilmington Pike, Kettering, Ohio 45420.

5. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. The United States, including the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Federal Bureau of Investigation ("FBI") are conducting a criminal

investigation of Vincent Miller (hereinafter "**MILLER**") a/k/a "Turk" regarding drug trafficking.

7. Tactical Crime Suppression Unit ("TCSU") controls a confidential informant (hereinafter referred to as "CI1") who is working for financial consideration. Since July 2018, CI1 has provided information that could be corroborated and assisted TCSU in multiple investigations. CI1 is believed to be reliable. CI1 is currently assisting FBI and ATF with a federal criminal investigation.

8. In early 2019, TCSU detectives began investigating Shaun QUILLEN (hereinafter referred to as "QUILLEN") through CI1's information that QUILLEN was selling heroin/fentanyl. CI1 has known QUILLEN for a number of years. TCSU detectives have conducted several undercover purchases of heroin/fentanyl from QUILLEN utilizing CI1 and an undercover officer.

9. CI1 said that approximately a year and half ago, QUILLEN introduced his source of supply -"Turk" - to CI1 and identified cellular telephone number (937) 397-1560 as belonging to "Turk." "Turk" was later identified by law enforcement as **MILLER**.

10. From April 2019 through June 2019, at law enforcement CI1 made undercover heroin/fentanyl purchases from **MILLER**. Also, during that time period, law enforcement conducted surveillance of **MILLER**. Through surveillance and other information, law enforcement identified 7707 Tanager Meadows, Trotwood, Ohio as a location where **MILLER** stayed with his girlfriend.

11. Among the undercover buys was one that occurred on or about April 2, 2019. TCSU Detective Gregory Stout and Director Robert Green met with CI1 at a predetermined location, and searched CI1's person for contraband and weapons with negative results. CI1 was provided with an electronic transmitting / recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050. On that same date, at the direction of TCSU, CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560. During the course of the call, CI1 spoke with a person who CI1 confirmed was **MILLER** and CI1 asked if he (**MILLER**) "can do a half O." **MILLER** responded "yeah." Using somewhat cryptic language, CI1 and **MILLER** confirmed the price of $1,050 and discussed a meeting location. **MILLER** advised the CI1 to meet him (**MILLER**) at "April's." CI1 stated April's address is 4998 Wolf Creek Pike, Dayton, Ohio. After the telephone call, CI1 got into his/her vehicle and left the staging location. During the undercover purchase, law enforcement was conducting surveillance and able to observe portions of the interaction. At approximately 2:39 p.m., CI1 arrived at 4998 Wolf Creek and shortly afterward **MILLER** arrived in the silver Ford Edge. CI1 greeted **MILLER** and asked him "what up boy." **MILLER** and CI1 had a brief discussion and then the CI1 exchanged the $1050 for a half ounce of suspected heroin/fentanyl. CI1 laughed, and **MILLER** stated "Ah be careful call me man...." CI1 replied, "I will man, I'm getting the hell out of here as fast as possible...." At approximately 2:40 p.m., **MILLER** and CI1 departed 4998 Wolf Creek Pike. The CI1 then proceeded back to a debrief location where CI1 turned over the suspected heroin/fentanyl to law enforcement. The suspected heroin/fentanyl was placed into property at the TCSU property room, and later sent to the Ohio Bureau of Criminal Investigation (hereinafter referred to as "BCI") laboratory for analysis. The suspected heroin/fentanyl

packaged in a plastic baggie weighed approximately 13.4 grams. Subsequent laboratory results determined the white powder to be 12.28 +/- 0.04 grams of Fentanyl.

12. Another undercover purchase occurred on or about on or about April 18, 2019. TCSU Detectives and Director Robert Green met with CI1 and searched CI1's person for contraband and weapons, producing negative results. CI1 was provided with an electronic transmitting /recording device and prerecorded buy money to purchase a half ounce of heroin/fentanyl for $1,050. CI1 placed a recorded cellular telephone call to **MILLER** at (937) 397-1560. CI1 had confirmed that the person he/she spoke with was **MILLER**. During the course of the call, CI1 asked if he (**MILLER**) "can do another half" and discussed a potential purchase of a firearm from **MILLER**. **MILLER** directed CI1 to 4998 Wolf Creek Pike. At approximately 2:30 p.m., CI1 arrived at 4998 Wolf Creek Pike at which time **MILLER** arrived in a black Nissan Rogue. CI1 ultimately approached **MILLER** who was sitting in the driver's side of the Nissan Rogue. According to CI1, they conducted the transaction through the driver's side window and exchanged the pre-recorded $1,050 for a bag of off-white powder. The recording device captured CI1 and **MILLER** discussing the pre-recorded buy money, and they followed up on their prior conversation about a "piece" (meaning a firearm). After the transaction, CI1 then returned to his/her vehicle. **MILLER** and CI1 departed 4998 Wolf Creek Pike, and CI1 ultimately turned over the suspected heroin/fentanyl, which was placed into the TCSU property room and later sent to BCI for analysis. The suspected heroin/fentanyl packaged in a plastic baggie weighed approximately 16.7 grams. Subsequent laboratory results determined the white powder to be 14.08 +/- 0.04 grams of fentanyl/heroin mixture. These two buys are examples of purchases made from **MILLER**.

5

13. On July 2, 2019, at approximately 6:09 p.m., Dayton Police Officer Luke Scott and Michael Schwartz, observed a male standing near a black Kia Sorento bearing Ohio license plate number HRJ9346. The vehicle had excessive window tint, an obstructed license plate and parked within 5 feet of a driveway in violation of state law. As they passed the vehicle, the officers could smell a strong odor of marijuana emitting from the vehicle. Officer Schwartz then made a U-turn to speak to the male in regards to the vehicle and smell of marijuana. As the officers conducted the U-Turn, the male who was standing outside of the vehicle (later identified as **MILLER**) closed the rear passenger side door and stepped away from the vehicle.

14. As Officer Luke approached the vehicle, they observed **MILLER** was nervous and asked to speak to him. The officers then patted **MILLER** down due to the smell of marijuana and found a large bag containing marijuana in his front pants pocket along with a large sum of U.S. currency. As Officer Luke escorted **MILLER** to the marked unit, Officer Schwartz made contact with a male seated in the front passenger seat of the vehicle who was later identified as Devion Loveless. After opening the front passenger door, Officer Schwartz was overwhelmed with an odor of marijuana which was emitting from inside the vehicle. Officer Schwartz observed a large gallon sized plastic bag full of marijuana (approximately 450 plus grams) at Loveless' feet. Officer Schwartz removed Loveless from the vehicle and placed him in the marked unit. Officer Schwartz conducted a query in their computer system and found that Loveless was currently on state parole and **MILLER** was on active federal probation.

15. Officer Scott continued searching the vehicle for illegal contraband and found multiple phones in the center console. Additionally, another large gallon bag of marijuana (approximately 200 plus grams) was located inside of a large, airtight container.

16. Officers seized the large plastic bags of marijuana and Avis rental agreement in the name of "Vincent Miller." Officers also seized seven (7) cellular telephones from **MILLER's** vehicle, namely:

   a. Verizon – Kyocera Model S2720, IMEI 014864005612224

   b. Verizon – LG Model VN170, S/N: 609CQRN1916846, MEID HEX: A10000415874B2

   c. Verizon – LG Model VN170, S/N: 704CQFT2323347, MEID HEX: A10000416ADE5F

   d. Verizon Casio CE0700, S/N 132901073135, MEID HEX: A1000029088CAF

   e. Verizon Casio CE0700, S/N 142501431069, MEID HEX: A10000290EECF0

   f. Black iPhone with no visible identifiers (presently contained in an FBI evidence bag labeled "1B37")

   g. Red iPhone with no visible identifiers (presently contained in an FBI evidence bag labeled "1B38")

17. On July 10, 2019, United States Magistrate Judge Sharon L. Ovington signed a search and seizure warrant for 7707 Tanager Meadows (case number 3:19MJ384) where **MILLER** was believed to be residing, based in part upon the presence of a vehicle that he operated parked there and information from a confidential source. **MILLER** was present in the home when the search warrant was executed on July 11, 2019.

18. On July 11, 2019, the FBI and ATF executed the search warrant at 7707 Tanager Meadows. During the search, agents and law enforcement officers seized two firearms, rifle magazines, ammo, suspected drugs and paraphernalia and a Glock gun box. Also, seized were six (6) cell phones:

   a. AT&T Pantech Model P2030, S/N: 1311001667161

   b. iPhone Model A1586, IMEI: 353028099100582

   c. Kyocera Model S2720, IMEI: 014864005962728

   d. Kyocera Model S2720, IMEI: 014864001170995

   e. Kyocera Model S2720, IMEI: 014864002274648

   f. Red iPhone with no visible identifiers (presently contained in an FBI evidence bag labeled "1B19")

**MILLER**'s girlfriend, who was present at 7707 Tanager Meadows during the search warrant execution, identified the six cell phones as belonging to **MILLER**.

19. On August 1, 2019, United States Magistrate Judge Michael J. Newman signed a federal search and seizure warrant for the thirteen electronic devices under case number 3:19MJ429.

20. On or about August 3, 2019, I discovered that Attachment A of the search and seizure warrant listed thirteen devices but some of the devices were inadvertently listed multiple times resulting in four devices not being listed at all. However, in the affidavit for the application, all thirteen electronic devices were correctly listed. The four electronic devices (2

Verizon Model LG VN170 and 2 Verizon Casio CE0700) not listed on Attachment A of 3:19MJ429 are listed below:

    a. Verizon – LG Model VN170, S/N: 609CQRN1916846, MEID HEX: A10000415874B2

    b. Verizon – LG Model VN170, S/N: 704CQFT2323347, MEID HEX: A10000416ADE5F

    c. Verizon Casio CE0700, S/N 132901073135, MEID HEX: A1000029088CAF

    d. Verizon Casio CE0700, S/N 142501431069, MEID HEX: A10000290EECF0

21. From my training and experience, traffickers often use cellular telephones to arrange transactions with their user-customers, often directing the customer to locations where the trafficker can meet them in a car (sometimes rental cars) and do a quick hand-to-hand exchange. In addition to using texts to arrange a single sale, it is common for traffickers to send text messages to the users informing them of price or the availability of a new supply of drugs (sometimes in a mass text to several people simultaneously). Traffickers commonly store the names and phone number of their user-customers, as well as those involved in drug trafficking with the trafficker (sometimes under alias or code names). Because cellular phones often have digital cameras built-in to the phone, it is common for traffickers to take pictures of themselves, their associates, proceeds, and other evidence of drug trafficking. Cellular phones can also store photographs sent to the phone electronically. It is common for traffickers to possess multiple phones because they may be transitioning from arranging sales on a particular phone to another phone as a law enforcement countermeasure, and because traffickers may use one phone to talk to customers while using other phones to communicate with a supplier or associate.

22. The Devices are currently in storage at located at 2329 Wilmington Pike, Kettering, Ohio 45420. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

## TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

10

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, GPS navigation device, and provide internet access. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine the Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Dennis C. Eng
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September 4, 2019:

HONORABLE SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1. The property to be searched:

    a. Verizon – LG Model VN170, S/N: 609CQRN1916846, MEID HEX: A10000415874B2

    b. Verizon – LG Model VN170, S/N: 704CQFT2323347, MEID HEX: A10000416ADE5F

    c. Verizon Casio CE0700, S/N 132901073135, MEID HEX: A1000029088CAF

    d. Verizon Casio CE0700, S/N 142501431069, MEID HEX: A10000290EECF0

The Devices are currently stored at 2329 Wilmington Pike, Kettering, Ohio 45420, in the Southern District of Ohio.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. § 843(b) (use of a telecommunication facility to facilitate a Title 21 violation) and 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute a controlled substance/distribution of a controlled substance/conspiracy to distribute and possess with intent to distribute a controlled substance) and involving Vincent Miller ("MILLER"), including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording MILLER's schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. photographs or other images of controlled substances, firearms, drug trafficking instruments (*e.g.* scales, cutting agents such as mannitol, packaging materials, presses), suppliers, assets and cash, or other matters related to drug trafficking.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage, text messages, and/or any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.